| | | |
|---|---|---|
| UNITED STATES for the use and benefit of BLACK HILLS HYDRO-TURF, INC., | ) ) ) ) | CIV. 10-5085-JLV |
| Plaintiff, | ) ) | **REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | ) ) | [DOCKET NO. 31] |
| GLENN C. BARBER & ASSOCIATES, INC., and LIBERTY MUTUAL INSURANCE CO., | ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

The key issue in this case is whether plaintiff Black Hills Hydro-Turf, Inc. ("BH Hydro-Turf") should be paid a lump-sum price for certain turf establishment work it promised Glenn C. Barber & Associates, Inc. ("GBA") that it would do, or whether BH Hydro-Turf should be paid on a per-square-foot basis for its work. Plaintiff Black Hills Hydro-Turf filed a complaint alleging that defendant GBA breached the terms of its contract with BH Hydro-Turf by failing to pay the entire amount due under that contract. See Docket No. 1. Defendant Liberty Mutual Insurance Co. ("Liberty") is obligated to pay amounts due from GBA to its subcontractors if GBA fails to make the contractually-required payments. GBA counterclaimed, alleging that BH Hydro-Turf failed to complete its work under the contract.

Jurisdiction is asserted based on the presence of a federal question under 28 U.S.C. § 1331.  Pending before the court is a motion by both defendants for partial summary judgment; they seek a judgment in their favor on all the claims BH Hydro-Turf asserts in its complaint, though the motion does not seek summary judgment in defendants' favor on GBA's counterclaim. <u>See</u> Docket No. 31.  The district court, the Honorable Jeffrey L. Viken, referred defendants' motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  The following is this court's recommendation.

## FACTS

### A.    The Complaint

When this court reviewed the complaint in this matter, it was noted that the complaint contained no jurisdictional averment.  Accordingly, the court issued an order to show cause why the complaint should not be dismissed for lack of subject matter jurisdiction.  BH Hydro-Turf responded by asserting that the basis for its complaint was a federal statutory scheme, the Miller Act, 40 U.S.C. §§ 3131 et seq.  BH Hydro-Turf filed an amended complaint with the exact same factual allegations as contained in the original complaint, but with a statement alleging the basis of the court's jurisdiction inserted into the document.

The allegations in the amended complaint are not averments that can be relied upon in resisting a summary judgment motion unless the complaint is a verified complaint. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The complaint in this case is not verified. Nevertheless, the court sets forth in some detail the allegations of the amended complaint so that the theory of recovery pleaded by BH Hydro-Turf is clearly in mind. GBA was awarded a government contract to perform certain residential construction on Ellsworth Air Force Base in South Dakota. GBA obtained a performance bond from defendant Liberty Mutual Insurance Company ("Liberty"). Under the terms of the bond, Liberty agreed to pay any subcontractor of GBA's who supplied labor or materials on the Ellsworth AFB contract and whom GBA failed or refused to pay. GBA's contract with the government required it to establish turf (basically, grass or lawn) in certain areas of the construction project. GBA subcontracted the turf establishment part of its Ellsworth AFB contract to plaintiff BH Hydro-Turf. Specifically, BH Hydro-Turf was to establish turf on certain residential and common areas as specified in GBA's contract with the government.

BH Hydro-Turf alleges in its amended complaint that the original subcontract between it and GBA, entered into on July 20, 2007, stated a fixed price of $443,700, and contemplated total square footage of 1,740,00 square feet. See Docket No. 49, ¶¶ 13-14. BH Hydro-Turf relies upon the subcontract

itself for the "fixed price" provision and upon a separate document, a GBA Subcontract Data Sheet, for the total square footage contemplated by the parties at the time of contracting.  Id. at ¶¶ 12-14.  BH Hydro-Turf alleges that the Subcontract Data Sheet was part of the contract between the parties.  Id. at ¶ 12.

BH Hydro-Turf alleges that approximately one year later, on May 14, 2008, BH Hydro-Turf contacted GBA and asserted that the square footage for both the residential and the common areas would be substantially more "than what was stated in the contract."  Id. at ¶ 16.  BH Hydro-Turf then states that it "confirmed a per unit price of $0.255 per square foot for the work to be performed."  Id.

The actual square footage for the entire project is alleged by BH Hydro-Turf to be 2,466,945 square feet (which would be an increase of 726,945 square foot over the originally contemplated square feet, or a 42 percent increase).  See id. at ¶ 20.  BH Hydro-Turf alleges that it is owed an additional $269,065.97 by GBA on the modified contract.  Id. at ¶ 15.  BH Hydro-Turf now seeks damages in that amount from defendants.  Id. at page 4, ¶ 1 of the prayer for relief.

**B.**   **GBA's Counterclaim**

GBA alleges that BH Hydro-Turf breached its subcontract with GBA by failing and refusing to finish all the turf establishment work required by the

subcontract.  See Docket No. 14, page 2.  GBA alleges that, due to BH Hydro-Turf's breach of contract, GBA sustained unspecified damages by having to complete the turf establishment work itself, or hire third parties to do so.  Id.  GBA does not state the amount of damages it sustained as a result of the alleged breach of contract by BH Hydro-Turf.  Id.

**C.     The Subcontract**

The document that both parties agree is part of the subcontract between GBA and BH Hydro-Turf provides that the agreement between the parties consists of the subcontract itself, plus "the Owner-Design-Builder agreement, special conditions, general conditions, specifications, drawings, addenda, Subcontract Change Orders, amendments and any pending and exercised alternates."  See Docket No. 36-6, page 3, ¶ 2.3.  The subcontract documents in existence at the time the subcontract was executed are listed in Article 13 of the subcontract.  Id.  Article 13 of the subcontract lists "GBA Standard Contract Forms" as documents which are incorporated by reference as a part of the parties' subcontract.  Id. at page 26, Art. 13, ¶ E6.  The contract provides that the subcontract "represents the entire and integrated agreement between the parties, and supersedes all prior negotiations, representations, or agreements, either written or oral."  Id. at page 3, ¶ 2.5.

The subcontract provides that GBA "agrees to pay [BH Hydro-Turf] in current funds for the satisfactory performance of the Subcontract Work subject

to all applicable provisions of the Subcontract:  (a) the fixed-price of Fourhundred [sic] fortythree [sic] thousand seven hundred Dollars ($443, 700) subject to additions and deductions as provided for in the Subcontract Documents; . . ."  <u>See</u> Docket No. 36-6, page 13, Art. 6, ¶ 6.1(a).

The subcontract between GBA and BH Hydro-Turf contains provisions applicable to the circumstances where changes in the subcontract work become necessary.  <u>See</u> Docket No. 36-6, page 14, Art. 7.  The subcontract provides that:

> When [GBA] orders in writing, the Subcontractor, without nullifying this Agreement, shall make any and all changes in the Subcontract Work which are within the general scope of this Agreement.  Any adjustment in the Subcontract Amount or Subcontract Time shall be authorized by a Subcontract Change Order.  No adjustments shall be made for any changes performed by the Subcontractor that have not been ordered by [GBA].  A Subcontract Change Order is a written instrument prepared by [GBA] and signed by the Subcontractor stating their agreement upon the change in the Subcontract Work.

<u>Id.</u> at ¶ 7.1.  Notably, although the above provision of the subcontract requires change orders to be in writing by GBA, it does not require that the written change order *precede* the work to be done or that BH Hydro-Turf halt work before embarking upon additional work that the parties have not reached agreement as to.  <u>Id.</u>

When the two parties agree upon a change order as envisioned by the above paragraph, the subcontract also specifies the method of determining any

adjustments to the payments made by GBA to BH Hydro-Turf under the

subcontract:

> If a Subcontract Change Order requires an adjustment in the
> Subcontract Amount, the adjustment shall be established by one
> of the following methods:
>
>> 1.      mutual acceptance of an itemized lump sum; or
>>
>> 2.      unit prices as indicated in the Subcontract Documents or as
>>         subsequently agreed to by the parties; or
>>
>> 3.      costs determined in a manner acceptable to the parties
>>         and a mutually acceptable fixed or percentage fee; or
>>
>> 4.      another method provided in the Subcontract
>>         Documents.

Id. at ¶ 7.4.

After the parties executed the main subcontract, there were four change

orders that both BH Hydro-Turf and GBA agreed to.  Three of those change

orders increased the amount of money GBA agreed to pay BH Hydro-Turf

under the subcontract and one change order reduced the total to be paid to BH

Hydro-Turf.  A fifth change order was never mutually agreed to.  The original

contract plus the four change orders increased the total GBA agreed to pay BH

Hydro-Turf to $476,044.

William Barber, then-president of GBA, spoke to Craig Knock, then-

owner of BH Hydro-Turf, via telephone and the two agreed to a unit price of

$0.255 per square foot as the appropriate pricing on the change orders.  See

Docket No. 39-2, pages 14-15.  Accordingly, GBA paid BH Hydro-Turf on each

7

of the four change orders on a per-square-foot basis at a rate of $0.255 per square foot rather than a lump sum.

Of the 42-percent increase in total square feet of turf required to be established by BH Hydro-Turf, neither party indicates whether any of the increase is attributed to any of the four change orders. In other words, neither party informs the court whether any of the increases in square feet on this project were also accompanied by increases in the contract price via the change orders.

The resolution of the disputes in this matter are complicated by the untimely death of Craig Knock. Craig Knock was the owner of BH Hydro-Turf during the period when the contract and change orders were negotiated. Accordingly, he engaged in the negotiations on behalf of plaintiff BH Hydro-Turf. However, he died on December 27, 2009. This litigation was initiated on November 17, 2010. Therefore, since Mr. Knock died before this action was filed, his deposition was never taken.

**D.     The Parties' Statements of Undisputed Material Facts**

Defendants set forth 19 separate statements of material facts they assert to be undisputed, and upon which they rely in their motion for summary judgment. They are set forth below, together with plaintiff's response thereto. In addition, plaintiff supplements the facts before the court with ten statements of fact of its own. Defendants did not file a formal response to

plaintiff's statement of facts.  To the extent the court can glean what

defendants' response is from the briefs and affidavits filed, the court has

indicated defendants' apparent response.

| Defendants' Statement of Fact | Plaintiff's Response |
|---|---|
| 1.  In 2006 GBA was awarded a federal government housing project at Ellsworth Air Force Base, known as the Project Replace Family Housing. | Admit |
| 2.  The scope of the work for turf establishment under this government contract was defined by the government's Request for Proposal ("RFP"). | Admit that the RFP defined the perimeter boundary for the construction project.  However, the scope of the work was defined in a later document created by GBA called the "for construction" design drawings.  Depo. of Bill Barber p. 8, lines 19-25; page 9, lines 1-3; p. 10, lines 17-25; page 14, lines 11-18. |
| 3.  On July 20, 2007, GBA entered into a subcontract with BH Hydro-Turf for the Ellsworth project. | Admit, but plaintiff takes issue with the document submitted by defendants to the court as being the totality of the contract.  The exhibit submitted by defendants to the court contains additional documents that were not provided to BH Hydro-Turf at the time of contracting.  Deposition of Michele Knock, pages 21-23; Deposition of Brian Chleborad at 28, lines 15-20;  41, lines 8-25; page 42, line 1. |
| 4.  Craig Knock executed the subcontract on behalf of BH Hydro-Turf. | Admit (with the above caveat). |

| | |
|---|---|
| 5.  The subcontract provides for payment of a "fixed price" of $443,700 for all of the work performed by BH Hydro-Turf on the subcontract. | Plaintiff admits this, but points out that the subcontract allowed for change orders and that the change orders could be approved on a number of bases, including a per-unit basis. |
| 6.  The subcontract does not make reference to square footage or to compensation based on any unit price. | Admit that the subcontract itself does not make reference to square footage, but the subcontract includes the GBA Subcontractor Data sheet, which does make reference to a total square footage of 1,740,000. Deposition of Michele Knock p. 25, lines 21-25; p. 26, lines 1-26; deposition of Brien Chleborad p. 57, lines 22-25; p. 58, lines 1-9. |
| 7.  The GBA Subcontract Data Sheet is not a "GBA Standard Contract Form" which is capable of being incorporated into the subcontract by reference. | Deny. |
| 8-18.  The GBA Subcontract Data Sheet was not part of any of the following exhibits to the subcontract: A, B, C, D, E-1, E-2, E-3, E-4, E-5, E-6, and E-7. | Admit.  However, plaintiff denies that the GBA Subcontract Data Sheet was not part of the subcontract. |
| 19.  The subcontract does not specifically reference the GBA Subcontractor Data Sheet. | Deny.  When the subcontract references "GBA Standard Contract Forms" it means documents like the GBA Subcontractor Data Sheet. |
| | |
| **Defendants' Response to Plaintiff's Additional Facts** | **Plaintiff's Additional Statements of Fact** |
| | 1.  The GBA Subcontract Data Sheet was provided to BH Hydro-Turf along with the subcontract in the same envelope. |

| | |
|---|---|
| Denied.  Exhibit 1 was marked without including the various exhibits and attachments that went along with the subcontract as a matter of convenience. | 2.  The document that has been testified to as being the subcontract between BH Hydro-Turf and GBA was marked as Exhibit 1 during Michele Knock's deposition. |
| | 3.  The fixed price of the subcontract was based on an estimate of 1,700,000 square feet.[1] |
| | 4.  BH Hydro-Turf actually established turf on 2,466,945 square feet under its subcontract with GBA |
| | 5.  The total square footage was calculated by Theodore Jones, a BH Hydro-Turf employee. |
| | 6.  Mr. Jones' measurements show that BH Hydro-Turf established turf on approximately 434,795.8 square feet in an area called the "southeast field." |
| Deny.  It is specifically included in contract design drawings completed by GBA in May, 2007, which was two months prior to when BH Hydro-Turf entered into the contract with GBA. BH Hydro-Turf would have been given these design drawings which included the southeast field prior to BH Hydro-Turf submitting its bid. | 7.  The 434,795.8 square feet in the southeast field does not appear to have been included in the Request for Proposal issued by the government. |

---

[1]The actual estimate was 1,740,000.  However, plaintiff's assertion is restated here, which was 1,700,000.

| | |
|---|---|
| Admit. | 8. The subcontract between BH Hydro-Turf and GBA specifically states that it includes "other provisions and documents," including "GBA Standard Contract Forms." |
| Admit that GBA considered documents supplied along with the subcontract to be part of the subcontract. GBA denies that there were any such documents that were not provided to BH Hydro-Turf along with the proposed subcontract. | 9. GBA considered other documents to be part of the subcontract with BH Hydro-Turf regardless of whether those other documents were or were not attached to the subcontract or whether those documents were or were not provided with the subcontract. |
| Admit. | 10. The parties used the price of $0.255 per square foot to add to and subtract from the original contract amount in the change orders agreed to by both GBA and BH Hydro-Turf. |

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The burden is placed on the moving party

to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if there is a genuine dispute as to a material fact—that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247-48.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248; see also 10A Charles A. Wright, Arthur Miller, & Mary Ann Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to
> entitle a party to proceed to trial is not required to be resolved

> *conclusively* in favor of the party asserting its existence; rather, all
> that is required is that sufficient evidence supporting the claimed
> factual dispute be shown to require a jury or judge to resolve the
> parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First Nat'l Bank of Arizona v. Cities

Serv. Co., 391 U.S. 253, 288-89 (1968)) (emphasis added).  Essentially, the

availability of summary judgment turns on whether a proper jury question is

presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The

inquiry performed is the threshold inquiry of determining whether there is the

need for a trial—whether, in other words, there are any genuine factual issues

that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

## B.    Federal Law Under the Miller Act Governs This Action

BH Hydro-Turf explicitly invokes the Miller Act, 40 U.S.C. §§ 3133 et seq.

as the basis of its claim against defendants.  See Docket No. 49, ¶¶ 4, 7, 9-10.

BH Hydro-Turf asserts only one claim–there are not multiple claims delineated

and pleaded in its amended complaint.  See Docket No. 49.  Thus, BH Hydro-

Turf has asserted solely a claim arising under the Miller Act.  It has not

specifically pleaded a separate state-law breach of contract claim.

Although this was made more clear in the amended complaint,

defendants were under no misapprehension as to the basis of plaintiff's claim

from the beginning.  Defendants stated in their original brief in support of

summary judgment (which brief was filed over two and one-half months prior

to the filing of the amended complaint), that "[t]his action is subject to federal jurisdiction by virtue of the Miller Act."  See Docket No. 32, page 10.

Defendants asserted in that same brief that "South Dakota law governs interpretation of the subcontract."  Id.  Thereafter, defendants discuss only South Dakota state law governing the interpretation of contracts.  BH Hydro-Turf, apparently not questioning defendants' assertion of the applicable law, also discusses and interprets only South Dakota state law.

However, it appears that defendants were in error as to their assertion of the law applicable to this action.  Defendants cited to Peter Kiewit Sons' Co. v. Summit Construction Co., 422 F.2d 242, 260 (8th Cir. 1969), in support of their assertion that state law governs the interpretation of the subcontract between a contractor and subcontractor on a government construction project under the Miller Act.  Defendants have misread this case.  The issues presented on appeal and discussed by the Eighth Circuit in Peter Kiewit Sons' Co. concerned *solely* a jury verdict rendered on a state law breach of contract claim.  Id. at 247-48.  The basis of the court's subject matter jurisdiction in that case was the diverse citizenship of the parties and an amount in controversy in excess of $75,000–not the Miller Act.  Id. at 248.  There were no issues raised on appeal dealing with the Miller Act.  Id. at 247-49.  Therefore, the court's statement that "a subcontract between private parties . . . is governed by state law" is limited to the situation where parties are suing one

15

another under a state law breach of contract theory. It does not resolve the matter of what law applies when the sole claim asserted, as is the case here, is a claim under the Miller Act.

The law applicable to a Miller Act claim is federal, not state, law. See F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc., 417 U.S. 116, 127 (1974); United States ex rel. Lighting and Power Services, Inc. v. Interface Const. Corp., 553 F.3d 1150, 1153 (8th Cir. 2009); Consolidated Electrical & Mechanicals, Inc. v. Biggs General Contracting, Inc., 167 F.3d 432, 436 (8th Cir. 1999). "Claims brought under the Miller Act . . . are federal causes of action and are separate and distinct from state law breach of contract actions." Biggs, 167 F.3d at 435. "[T]he substance of the rights created [under the Miller Act] is a matter of federal not state law." In re Lighting and Power Servs, Inc., 553 F.3d at 1153. Although a plaintiff may choose to assert in its complaint a Miller Act claim and also a separate breach of contract claim based on state law, the Miller Act claim continues to be governed by federal law. Biggs, 167 F.3d at 435-36. If a plaintiff wishes to assert a state law breach of contract claim, it must be "specifically plead." Id. at 435.

Here, the amended complaint alleges only one claim–a Miller Act claim. Therefore, federal law that has developed under the Miller Act applies. The Miller Act was enacted to help subcontractors who worked on government

construction projects.  <u>Biggs</u>, 167 F.3d at 434.  The usual remedy for a

subcontractor who is not paid amounts due to them by the general contractor

on a private construction project is to file a mechanic's lien against the

property.  <u>F.D. Rich Co.</u>, 417 U.S. at 122.  However, subcontractors on

government projects are barred from filing liens against government property.

<u>Biggs</u>, 167 F.3d at 434.  Therefore, the Miller Act ensures that the

subcontractors will be able to recover for materials and labor contributed to

government projects.  <u>Id.</u>  The Miller Act is "highly remedial" and is to be

liberally construed to accomplish its purpose of protecting subcontractors who

expend labor and materials on public projects.  <u>F.D. Rich Co.</u>, 417 U.S. at 124.

There are special rules that apply to Miller Act claims that are different

from state law contract claims.  For example, the subcontractor can recover the

expenditures they have made for materials and labor, even if the general

contractor is not at fault–i.e. if the general contractor has not breached the

contract.  <u>Biggs</u>, 167 F.3d at 434-35.  In addition, under the Miller Act, a

subcontractor is limited to recovering its out-of-pocket expenditures for labor

and materials and may not recover for lost profits, even if lost profits would be

recoverable under the respective state contract law.  <u>Id.</u> at 435-36.

A subcontractor wishing to make a Miller Act claim must provide notice

to the surety within 90 days of the last day on which labor or material for

which it has not been paid was supplied, and must commence its civil action in

federal district court within one year.  See 40 U.S.C. § 3133.[2]  Other aspects of federal law under the Miller Act will be discussed below as appropriate.

## C.    Whether Defendants Are Entitled to Judgment as a Matter of Law

BH Hydro-Turf's claim rests on two allegations:  (1) the allegation that the subcontract data sheet was incorporated by reference into the parties' subcontract and creates an ambiguity in the contract which allows the court to consider parol evidence as to whether this was a fixed-sum or a per-square-foot contract and (2) the allegation that BH Hydro-Turf did extra work not called for by the original contract and should be paid for the extra work on a per-square-foot basis.

As to each of these allegations, defendants must establish that there are no disputed material facts and that defendants are entitled to judgment as a matter of law.

On issues of contract interpretation, although the federal law of contracts controls, state law–where it does not conflict with federal law–may be used to "fill the interstices."  See United States ex rel. Norbeck v. Basin Electric Power Cooperative, 248 F.3d 781, 796 (8th Cir. 2001); A.W.G. Farms, Inc. v.

---

[2]Neither party recites when the last day was that BH Hydro-Turf supplied labor or materials on this project.  Neither defendant has asserted an affirmative defense based on the statute of limitations.  See Docket No. 13.  The affirmative defense of failure to file a claim within the statute of limitations must be asserted in the answer.  See FED. R. CIV. P. 8(c)(1).  The deadline for making any motions to amend the pleadings, including amending the answer, was April 15, 2011.  See Docket No. 18, ¶3.

Federal Crop Ins. Corp., 757 F.2d 720, 726 (8th Cir. 1985). Cf. Aetna Cas. & Sur. Co. v. United States ex rel. R.J. Studer & Sons, 365 F.2d 997, 999-1002 (8th Cir. 1966); L & E Co. v. United States ex rel. Kaiser Gypsum Co., 351 F.2d 880, 883 (8th Cir. 1965); United States ex rel. Astro Cleaning & Pckg. Cor. v. Jamison Co., 425 F.2d 1281, 1282 n.1 (6th Cir. 1970). In this regard, courts are directed to "take into account the best in modern decision and discussion" of contract law. Basin Elec. Pwr. Coop., 248 F.3d at 796. The law cited in this opinion will be the federal common law of contracts, where discernable. South Dakota law is also cited where necessary to "fill the interstices."[3]

**1.   Whether the Subcontract Data Sheet was Part of the Contract and Whether That Creates a Per-Square-Foot Contract or an Ambiguity**

The interpretation of a contract is a question of law. Hanson v. Vermillion Sch. Dist. No. 13-1, 2007 S.D. 9, ¶24, 727 N.W.2d 459, 467. Courts must interpret the contract so as to attempt to give effect to the intention of the parties. A.W.G. Farms, Inc., 757 F.2d at 726; Bunkers v. Jacobson, 2002 S.D. 135, ¶ 15, 653 N.W.2d 732, 738. To ascertain the intent of the parties, the court looks to the language of the contract. Fenske Media Corp. v. Banta Corp., 2004 S.D. 23, ¶ 8, 676 N.W.2d 390, 393. Contract language must be interpreted "in an ordinary and popular sense as would a person of average

---

[3]At least one District Judge from this district has found no difference between the federal common law of contracts and South Dakota state contract law. See Ambur v. United States, 206 F. Supp. 2d 1021, 1026 (D.S.D. 2002).

intelligence and experience." <u>Funeral Financial Sys. v. United States</u>, 234 F.3d 1015, 1018 (7th Cir. 2000). Contracts must be construed in their totality, giving effect and meaning to each term in the contract. <u>AFSCME v. Sioux Falls Sch. Dist.</u>, 2000 S.D. 20, ¶ 8, 605 N.W.2d 811, 813-14.

Whether a contract is ambiguous is also a question of law. <u>Funeral Financial Sys.</u>, 234 F.3d at 1018; <u>Bunkers</u>, at ¶ 15, 653 N.W.2d at 738. "The language of a contract is ambiguous if a section of that contract 'is subject to reasonable alternative interpretations.' " <u>Funeral Financial Sys.</u>, 234 F.3d at 1018 (quoting <u>Grun v. Pneumo Abex Corp.</u>, 163 F.3d 411, 420 (7th Cir. 1998)). <u>See also</u> <u>Bunkers</u>, at ¶ 15, 653 N.W.2d at 738. If a contract is not ambiguous, the court is not to apply rules of construction. <u>Pankratz v. Hoff</u>, 2011 S.D. 69, ¶ 10 n.*, 806 N.W.2d 231, 235 n.*. <u>See also</u> <u>Funeral Financial Sys.</u>, 234 F.3d at 1018 (stating that "If a contract is not open to any other reasonable interpretations, and is therefore unambiguous, then the written words of the contract must dictate the disposition of a dispute involving that contract.").

As indicated above in the "Facts" section of this opinion, the document that both parties agree is part of the subcontract between GBA and BH Hydro-Turf provides that the agreement between the parties consists of the subcontract itself, plus "GBA Standard Contract Forms." <u>See</u> Docket No. 36-6, page 3, ¶ 2.3; page 26, Art. 13, ¶ E6. The contract also provides that that document "represents the entire and integrated agreement between the parties,

and supersedes all prior negotiations, representations, or agreements, either written or oral." Id. at page 3, ¶ 2.5.

Craig Knock's wife, Michelle Knock, worked as an employee for BH Hydro-Turf at the time plaintiff entered into the subcontract with GBA. See Docket No. 36-3, page 2. When GBA contacted BH Hydro-Turf to tell it that the contract was ready to be picked up, Mrs. Knock personally retrieved the subcontract documents from GBA and delivered them to her husband for him to read and sign. See Docket No. 39-8, pages 3, 6. When Mrs. Knock arrived at GBA's office, GBA gave her a packet of documents. Id. The subcontract data form, see Docket No. 1-2, was in a manilla envelope attached with a binder clip to the top of the packet containing the subcontract. See Docket No. 39-8, page 6. Mrs. Knock interpreted this to mean that the subcontract data sheet was part of the subcontract. Id.

The significance of this, according to BH Hydro-Turf, is that the subcontract alone does not refer to any unit pricing or total square footage. However, the subcontract data sheet does refer to total square footage. It recites that the subcontract work is for seeding, mulching, fertilizing, final surface prep, and maintenance through final acceptance by the government for 440,000 square feet of lawn area and 1.3 million square feet of common areas. See Docket No. 1-2, page 1 (middle of the page).

BH Hydro-Turf does not argue that the subcontract data sheet creates a contract whereby it was to be paid on a per-square-foot basis, however. Instead, as BH Hydro-Turf states in its complaint, the original subcontract created a contract whereby BH Hydro-Turf agreed to perform the turf establishment work covered by the contract for a fixed lump sum price of $443,700.  See Docket No. 49, page 3, ¶ 14.  The square feet recited in the subcontract data sheet appears to have been closely related to BH Hydro-Turf's subcontract bid.[4]

However, rather than contradicting the flat-fee nature of the subcontract, the subcontract data sheet *confirms* that the contract is for a fixed, lump sum price.  See Docket No. 49-2, page 2, ¶ 11, 6.1(a).  Thus, whether the subcontract data sheet is part of the subcontract or not, there appears to be no ambiguity about the terms of payment.  *Both* documents recite that BH Hydro-Turf was agreeing to do the turf establishment work covered by its subcontract with GBA for a fixed, lump-sum price.  See id.; and Docket No. 36-6, page 13, Art. 6, ¶ 6.1(a).

Because of the circumstances attending GBA's delivery of the subcontract to BH Hydro-Turf, specifically the inclusion of the subcontract

---

[4]The total square feet for both lawns and common areas as recited on the subcontract data sheet equals 1,740,000 square feet.  Multiplying that square footage figure by $0.255 (the per-square-foot figure used by both parties on the change orders) equals the total contract bid price submitted by BH Hydro-Turf of $443,700.

data sheet with other subcontract documents, and the attachment of one to the other, the court finds that there is a material question of fact as to whether the subcontract data sheet was incorporated by reference into the main subcontract via the reference to "GBA Standard Contract Forms."

GBA drafted the contract. When the draft was completed, it contacted BH Hydro-Turf and told it to come pick up the document. When BH Hydro-Turf took delivery of the subcontract from GBA, the subcontract data sheet was affixed to the main subcontract and delivered together with it. The conclusion by BH Hydro-Turf that the subcontract data sheet was part of the subcontract is entirely reasonable.[5] Although the terms of the contract are not ambiguous, the court finds that whether the subcontract data sheet was part of the contract *is* ambiguous. Since GBA drafted the contract, the ambiguity concerning whether the subcontract data sheet is part of the contract is construed against GBA. See A.W.G. Farms, Inc., 757 F.2d at 726; Prod. Credit Ass'n. of the Midlands v. Wynne, 474 N.W.2d 735, 740 (S.D. 1991).

---

[5]GBA asserts that the subcontract data sheet was only an internal document used by GBA to give to clerical staff so that they would know what terms to insert into the form contract to be drafted. GBA asserts that the data sheet was never intended to be seen by BH Hydro-Turf or given to that company. The court has no reason to doubt these assertions and BH Hydro-Turf does not attempt to counter them. The fact remains, however, that the data sheet was conveyed by the drafter of the agreement together with the agreement and affixed thereto.

However, the court's conclusion that there is a material question of fact as to whether the subcontract data sheet is part of the contract is unavailing to BH Hydro-Turf. Both the subcontract itself and the accompanying subcontract data sheet are in accord about the fixed, lump-sum nature of the contract. See Docket No. 49-2, page 2, ¶ 11, 6.1(a); and Docket No. 36-6, page 13, Art. 6, ¶ 6.1(a). The two documents are unambiguous on this point. The data sheet states:

subcontract amount

**653-050-00248 Total Scope $443,700.00**

a)      Fixed-price of $443,700.00.

See Docket No. 1-2, Page 2, ¶ 11, 6.1(a). The subcontract is equally clear:

> As full compensation for performance of this Agreement, [GBA] agrees to pay [BH Hydro-Turf] . . . the fixed-price of Fourhundred [sic] fortythree [sic] thousand seven hundred Dollars ($443,700.00) subject to additions and deductions as provided for in the Subcontract Documents;

See Docket No. 36-6, page 13, Art. 6, ¶ 6.1(a). The court holds that the subcontract is unambiguous and that it provides for a lump-sum, flat-fee payment for turf establishment.

The Prunty case, cited by BH Hydro-Turf, held that the contract in that case was a unit-bid contract, but the language of the Prunty contract differed materially from the language in the GBA-BH Hydro-Turf contract. In Prunty, the city advertised for bids for the construction of a water main and a sanitary

24

sewer.  Prunty Constr., Inc. v. City of Canistota, 2004 S.D. 78, ¶2, 682 N.W.2d

749, 751.  The advertisement for bids used unit prices for the major items

needed to complete the construction.  Id. at ¶ 12, 682 N.W.2d at 754.

The city also drafted the bid form which contractors were to use in

submitting their bids, and that form too was organized by estimated units for

the project and unit prices.  Id. at ¶ 13, 682 N.W.2d at 755.  The contract

provided for payment in "the sum of $_____ or as shown in the BID

schedule."  Id.  When the contract was filled out, the total of each unit in the

contractor's bid was inserted into the blank space on the BID form.  Id.  The

court held that this created a per-unit-price contract.  Id. at ¶ 15, 682 N.W.2d

at 755-56.  Here, there is no document indicating that GBA sought a bid from

turf establishers on a per-square-foot basis.  Furthermore, GBA did not draft

the bid document that BH Hydro-Turf submitted.  Finally, the subcontract

itself unambiguously provided for a flat-fee, fixed-price payment.

Michelle Knock testified that her husband was under the belief from the

beginning when he entered into the contract on behalf of BH Hydro-Turf that

GBA was agreeing to pay his company on a "unit basis" or per-square-foot

basis.  See Docket No. 39-8, page 5.  However, this testimony by Mrs. Knock

constitutes parol evidence which contradicts the unambiguous "flat-fee" nature

of the subcontract *and* the subcontract data sheet.  Where a contract is

unambiguous on its face, parol evidence is inadmissible to contradict the terms

of the contract.  <u>Funeral Financial Sys.</u>, 234 F.3d at 1018; <u>Butler Machinery</u>

<u>Co. v. Morris Const. Co.</u>, 2004 S.D. 81, ¶ 11, 682 N.W.2d 773, 777.

Accordingly, the court may not consider parol evidence from Mrs. Knock

concerning negotiations prior to the execution of the subcontract.[6]

BH Hydro-Turf's reliance on the case of <u>Delzer Construction</u> is

inapposite.  <u>Delzer Constr. Co. v. South Dakota State Bd. of Transp.</u>, 275

N.W.2d 352 (S.D. 1979).  In that case, as to the issue disputed by the parties,

the parties' contract was silent.  <u>Id.</u> at 354.  In addition, the court held that the

contract was ambiguous, and thus that parol evidence could be considered.  <u>Id.</u>

at 355.  The contract in <u>Delzer</u> stands in stark contrast to the contract in this

case.  Neither the subcontract nor the subcontract data sheet was silent as to

the method of payment.  Furthermore, what each document stated as to the

method of payment was unambiguous:  payment was to be on a fixed-price,

flat-fee basis.

In addition to the fact that Mrs. Knock's testimony is inadmissible parol

evidence, this court notes that Craig Knock's actions contradict his wife's

testimony in two respects.  First, if Craig Knock truly believed that BH Hydro-

Turf would be paid on a per-square-foot basis, there would be no cause for

alarm upon discovering that the actual square footage called for by the project

---

[6]The parol evidence rule is not a rule of evidence, but a substantive legal
rule.  <u>Butler Machinery Co.</u>, at ¶ 11, 682 N.W.2d at 777.

was "substantially more" than the square footage originally contemplated by the parties.  See Docket No. 49, page 3, ¶ 16.  After all, *if* BH Hydro-Turf were being paid on a per-square-foot basis, all it had to do was document the square footage it established turf on, submit a bill to GBA, and it would have been paid.  That is the open-ended nature of a per-unit contract.

Instead, the discovery of the increased square footage caused Craig Knock to "confront" GBA agents (in Mrs. Knock's words).  See Docket No. 39-8, page 4.  This "confrontation" is entirely consistent with one who signed a flat-fee agreement with the understanding that the square footage was one figure, only to discover later that the actual square footage was much greater.  Such a discovery is bound to provoke consternation in the one who has agreed to perform the entirety of the work for a flat fee.

The second action by Craig Knock that belies Mrs. Knock's assertion that Craig thought he had signed a contract that provided for paying him on a per-square-foot basis is the manner in which BH Hydro-Turf billed GBA for interim payments during the course of the contract.  BH Hydro-Turf submitted interim bills to GBA for payment under the contract on July 31, 2008, for $90,000; August 27, 2008, for $74,000; September 29, 2008, for $210,000; and December 18, 2008, for $44,389.  See Docket No. 43-9.  GBA paid each of

these invoices, which total $418,389.00.[7]  The invoices from BH Hydro-Turf do not reflect that the interim billings were being made on a per-square-foot basis, but rather they appear to be based upon the percent of the total project completed to date as a ratio of the total flat-fee of the contract.  Id.  "The construction [of a contract] given by the parties themselves to the contract *as shown by their acts*, if reasonable, will be accorded great weight and usually will be adopted by the court."  Aetna Casualty & Surety Co. v. United States ex rel. R.J. Studer & Sons, 365 F.2d 997, 1002 (8th Cir. 1966) (quoting Huffman v. Shevlin, 76 S.D. 84, 72 N.W.2d 852, 855) (emphasis supplied).  Here, the acts of Craig Knock show that his interpretation of the contract was in accord with the plain language of the contract–it was a lump sum contract.

    The court's conclusion that the contract is unambiguous and provides for a flat-fee payment is also supported by the testimony of Brian Chleborad, the GBA employee that negotiated the turf establishment contract with Craig Knock.  Mr. Chleborad testified that, *prior* to entering into the subcontract with GBA, Mr. Knock was aware that the square footage for the commons areas was undefined.  See Docket No. 39-1, page 9-10.  Knock asked GBA to consider

_____

    [7]Docket No. Docket 43-9, page 8 lists $419,389 as the total billed.  However, another affidavit lists $418,389.00 as the total.  See Docket 34 ¶ 20.  The court assumes the latter to be the correct amount based on adding the individual amounts together and assumes the former to be a typographical error.  In any event, the difference is not material for purposes of the pending motion.

entering into a unit-price or per-square-foot contract. Id. Chleborad refused and told Knock that GBA was going to award the turf establishment contract on a flat-fee basis. Id. at page 10.

Knock asked Chleborad to make inquiry of William Barber, GBA's then-President, as to whether Barber would consider entering into a unit-price contract. Id. Chleborad asked, but Barber reiterated what Chleborad had told Knock: GBA would only enter into a flat-fee subcontract for the turf establishment part of the government contract. Id. After this back-and-forth discussion between the parties, BH Hydro-Turf nevertheless entered into the subcontract, which unambiguously states that it is for a flat fee.[8]

BH Hydro-Turf has succeeded in deflecting the legal argument that the subcontract data sheet is not part of the contract (the court does not affirmatively so hold because BH Hydro-Turf is not itself moving for partial summary judgment at this juncture). As stated above, however, this does not change the court's legal conclusion that the original subcontract, including the

_____

[8]The testimony of these events is parol evidence because it constitutes discussions that took place before the execution of the contract. "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." S.D. Codified Laws § 53-8-5 (2012) (as stated in Butler Machinery Co., at ¶ 11, 682 N.W.2d at 777). The court does not consider this as substantive evidence pertaining to the interpretation of the contract, but discusses it only for background and illustrative purposes. As with Mr. Knock's conduct *after* the execution of the contract, his conduct *prior* to execution of the contract is in accord with the unambiguous terms of the contract.

subcontract data sheet, unambiguously provides for a flat-fee payment to BH Hydro-Turf.  The later discovery that the project required turf establishment on more square feet than anticipated does not change the unambiguously flat-fee nature of the subcontract.

### 2. Did the Parties Mutually Agree to Modify the Contract?

BH Hydro-Turf alleges in its amended complaint that in May, 2008, it became aware that the square footage for the landscaping work that BH Hydro Turf was to perform on the project was "substantially more" than the square footage "stated in the contract"—by which the court infers that BH Hydro-Turf is referring to the square feet recited in the subcontract data sheet.  <u>See</u> Docket No. 49, page 3, ¶ 16.  The amended complaint then says that "[BH Hydro-Turf] confirmed a per unit price of $0.255 per square foot for the work to be performed."  <u>Id.</u>  Given BH Hydro-Turf's concession in its amended complaint that the original contract was for a fixed, lump-sum price (<u>see</u> Docket No. 1, page 2, ¶ 8), the court interprets paragraph 16 of the amended complaint to allege that the parties mutually agreed to modify the contract upon

determining that the scope of the project was much larger than originally anticipated.[9]  This is adamantly denied by GBA.

William Barber, who was president of GBA during the government contract in question, testified that in August, 2009, Craig Knock told him that he believed his contract entitled him to be paid on a unit basis.  See Docket No. 39-2, page 6.  When Mr. Knock said this, Mr. Barber retrieved the subcontract between GBA and BH Hydro-Turf and showed Mr. Knock the provision in the contract that stated that the contract was a flat-fee contract.  Id. at page 7.  In response, Mr. Knock retrieved the subcontract data sheet from his truck and showed it to Mr. Barber.  Id.

Mr. Barber explained in his deposition that, although the 440,000 square feet of lawn area that was specified in the government request for proposal ("RFP") was known prior to the GBA-BH Hydro-Turf subcontract being entered into, the government could not contemplate from the point in time that it issued the RFP what the square feet would be for the common areas that would have to be reseeded.  Id. at pages 7-8.  That was because the common areas were areas that were disturbed during the construction project and would have

---

[9]The court notes that BH Hydro-Turf does not argue mutual modification of contract in its brief in opposition to defendants' motion for partial summary judgment.  However, defendants' motion for a defense judgment on plaintiff's complaint puts in issue all claims and theories of recovery raised in plaintiff's complaint.  Therefore, the court addresses each theory of recovery which can fairly be said to be raised in the complaint.

to be reclaimed at the end of the project.  Id.  Thus, *prior* to the construction occurring, neither the government, nor GBA, nor BH Hydro-Turf would have known with any certainty what the square feet of any common areas disturbed by construction (that had not yet taken place) were going to be.  Id.

Craig Knock, negotiating on behalf of BH Hydro-Turf was aware of the unknowable nature of the total square feet of the common areas prior to the project being completed.  In his bid dated August 26, 2006, he stated:  "There is also a potential for approximately 10,000 [square feet] collateral damage to surrounding grass areas that would have to be considered.  *Actual quantities of disturbed areas are not drawn out on the plans.*  A comprehensive construction plan and subcontractor education would probably go a long way towards reducing reclamation costs."  See Docket No. 43-3, page 1 (emphasis supplied).  In other words, Mr. Knock knew that the collateral damage–the common areas--was an unknown, and he hoped that by educating the subcontractors working on the project, they would keep the collateral damage to a minimum.  See id.

BH Hydro-Turf apparently relies on a document it drafted and sent to GBA for support of its "modification of the contract" theory.  See Docket No. 1-3.  The document in question is dated May 14, 2008, and is addressed to Brian Chleborad at GBA.  Id.  Craig Knock signed the document.  Id.  The memo explains that Knock based his original bid to GBA on a average, pro-rated rate of $0.255 per square foot for all turf establishment.  Id.  The memo also asserts

that it believes there would be approximately 900,000 square feet of lawn seeding done under the contract and 1.3 million square feet of common area seeding done.  Id.

What the document does *not* recite is that GBA *agreed* to a unit-price basis for the original contract or that GBA was *agreeing* to modify the original contract to reflect a change to payment on a unit basis.  Id.  The document is strictly one-sided, setting forth the demands/views of BH Hydro-Turf only and not the necessary agreement by GBA to those demands.  Id.  Mr. Knock, in a subsequently-written document, acknowledges that GBA was refusing to modify the contract to a unit-price contract.  In a memo to Bill Barber dated August 31, 2009, Mr. Knock wrote that GBA was disagreeing with BH Hydro-Turf's insistence upon payment on a per-square-foot basis and that the parties would continue the discussion.  See Docket No. 1-4.

The terms of a contract can be modified by the parties subsequent to entering into the contract, but the agreement to modify the terms must be mutual.  Ahlers Bldg. Supply, Inc. v. Larsen, 535 N.W.2d 431, 435 (S.D. 1995). Modification of the contract cannot be brought about by unilateral action on the part of one party alone.  Id.  Thus, the letters BH Hydro-Turf sent to GBA in May, 2008, and August, 2009, did not have the effect of modifying the contract into a per-square-foot contract because GBA did not assent to this modification.

33

Contracts may also be modified by the court through reformation.  Nat'l. Union Fire Ins. Co. v. D & L Construction Co., 353 F.2d 169, 174 (8th Cir. 1965).  See also Teutsch v. Hvistendal, 72 S.D. 195, 195, 31 N.W.2d 566, 566 (1948).  However, reformation can be accomplished only where there is evidence of fraud, mutual mistake, or a unilateral mistake by one party which the other party knew of at the time.  Nat'l. Union Fire Ins. Co., 353 F.2d at 174; Teutsch, 72 S.D. at 195, 31 N.W.2d at 566.  Here, there is no evidence or assertion of fraud or mutual mistake.  Neither is there any evidence of a unilateral mistake by one party of which the other party was aware.  BH Hydro-Turf knew before it entered into the contract that it was a flat-fee contract because it tried to negotiate a per-square-foot contract and GBA refused.

In addition, the change orders, for which GBA paid BH Hydro-Turf on a per-square-foot basis, did not change the fact that the subcontract proper was a flat-fee contract.  The subcontract specifically provided that the parties could agree to any method of payment on the change orders that they both mutually assented to.  See Docket No. 36-6, page 14, Art. 7, ¶ 7.4.  The subcontract also specifically provided that any change orders executed by the parties did not nullify any of the terms in the subcontract proper.  See id. at ¶ 7.1 (GBA may issue change orders and the subcontractor, "without nullifying this Agreement," shall make any and all changes so ordered).

In <u>Aetna Casualty & Surety Co. v. United States ex rel. R.J. Studer &</u>

<u>Sons</u>, 365 F.2d 997, 1001 (8th Cir. 1966), a subcontractor on a Miller Act

project in turn subcontracted out some excavation work to a sub-

subcontractor.  The contract between these two provided for payment of a lump

sum payment for all the excavation work, but also anticipated that additional

sums would be paid if the government, the general contractor, or the first

subcontractor required additional excavation.  <u>Id.</u>  Payment for any changes to

the original excavation work depended on whether it was additional "initial"

excavation which could be done with a scraper, or whether it was additional

"excess" excavation which could only be done with a backhoe.  <u>Id.</u> at 1001-02.

The rate for scraper excavation was $0.40 per cubic yard, while the rate for

backhoe excavation was $1.75 per yard.  <u>Id.</u>  The court found that the

additional excavation was "excess" excavation and, accordingly, held that the

sub-subcontractor was entitled to be paid at a rate of $1.75 per cubic yard for

the additional work.  <u>Id.</u>  Notably, the fact that changes to the contract were to

be paid for on a per-cubic-yard basis did not change the fact that the basic

price to be paid on the contract was a lump sum contract.  <u>Id.</u>

Thus, the court finds that the undisputed material facts show that,

although BH Hydro-Turf apparently attempted to negotiate a modification of

the contract to a per-square-foot payment basis, GBA did not agree.  Thus,

there could be no modification as a matter of law.  <u>Ahlers Bldg. Supply, Inc.</u>,

535 N.W.2d at 435.

### 3. Was BH Hydro-Turf Entitled to a Change Order for the Additional Work?

The subcontract between BH Hydro-Turf and GBA required BH Hydro-

Turf to establish turf on all areas indicated in the government's request for

proposal and in GBA's design drawings.  The subcontract also contained

provisions addressing what was to happen if BH Hydro-Turf did work not

contemplated by the original contract:

> When [GBA] orders in writing, the Subcontractor, without nullifying this Agreement, shall make any and all changes in the Subcontract Work which are within the general scope of this Agreement.  Any adjustment in the Subcontract Amount or Subcontract Time shall be authorized by a Subcontract Change Order.  No adjustments shall be made for any changes performed by the Subcontractor that have not been ordered by [GBA].  A Subcontract Change Order is a written instrument prepared by [GBA] and signed by the Subcontractor stating their agreement upon the change in the Subcontract Work.

<u>See</u> Docket No. 36-6, page 14, Art. 7.  As noted previously in this opinion,

although the above provision requires that any change order be in writing by

GBA, the provision does not require that a written change order from GBA is a

condition precedent to any extra work done by BH Hydro-Turf.

The additional square footage allegedly completed by BH Hydro-Turf on

this project is troublesome.  BH Hydro-Turf alleges that it completed turf

establishment on 2,466,945 square feet whereas the parties both contemplated

at the beginning of the contract that the total square footage would be 1,740,000.  Neither party satisfactorily explains what occasioned this additional work of 726,945 square feet of work.  GBA does not dispute BH Hydro-Turf's assertion of the total square footage of work it did on this project.

There were four change orders executed by the parties.  The first increased the contract amount to be paid to BH Hydro-Turf by $18,900.  <u>See</u> Docket No. 32, page 9, n.3.  The second increased the contract amount by $11,685.  <u>Id.</u>  The third increased the contract amount by $5,783.  <u>Id.</u>  And the fourth decreased the contract amount by $4,024.  <u>Id.</u>  Neither GBA nor BH Hydro-Turf explain to the court whether those change orders account for all or any part of the additional square footage asserted by BH Hydro-Turf.  In addition, GBA alleges in its counterclaim that BH Hydro-Turf failed to complete all of the work called for by the subcontract, but neither party sheds any light on what the total square footage of unfinished work was, where it was, and whether it was work called for by the original subcontract or whether the areas not finished resulted from a change to the original subcontract.

BH Hydro-Turf suggests that the difference between the original and the final square footage may have come from the "southeast field" which BH Hydro-Turf asserts was not in the government's original request for proposal.  However, this does not appear to explain the extra square footage as GBA has produced drawing from May 14, 2007, two months before BH Hydro-Turf

entered into the subcontract in July, 2007, showing that the southeast field was included in the areas for which turf was to be established. See Docket No. 36-5, pages 10 and 11. Therefore, it appears that the southeast field was always included in the parties' subcontract.

Since neither party adequately explains where the extra square footage came from, the court is also unable to assess whether BH Hydro-Turf had a right to be paid for the extra work. As discussed above, changes to the contract by the government or GBA in terms of the scope of turf establishment work on this project gave rise to a right on the part of BH Hydro-Turf to have a change order executed and to be paid extra money. See Docket No. 36-6, page 14, Art. 7. However, if the extra square footage simply came about because there was a greater disturbance in the common areas from the construction activities of the project, BH Hydro-Turf would not have a right to be given extra compensation for this work. Both BH Hydro-Turf and GBA knew at the outset of their subcontract that the amount of work to be done in the common areas was an unknown and that BH Hydro-Turf was shouldering the risk if the work in the common areas turned out to be greater than anticipated (BH Hydro-Turf would also be the beneficiary if the work in the common areas turned out to be less than the area estimated at the beginning of the contract).

There are genuine issues of material fact concerning whether BH Hydro-Turf did extra work not contemplated by the original contract and, if so,

whether it had a right to be paid extra for that additional work.  Accordingly,

the court recommends that defendants' motion for partial summary judgment

be denied.

### 4.    Has GBA Broken a Covenant of Good Faith & Fair Dealing?

The complaint filed by BH Hydro-Turf in this case does not allege that

GBA breached a contractual covenant of good faith and fair dealing.  However,

BH Hydro-Turf raises this argument in its brief in opposition to defendants'

motion for partial summary judgment.  In order to provide a complete record

on defendants' motion for the district court, the court addresses this argument.

Under South Dakota law, as well as the federal common law of contracts,

every contract contains an implied covenant of good faith and fair dealing.  See

Basin Elec. Power Co-op, 248 F.3d at 796; Garrett v. BankWest, Inc., 459

N.W.2d 833, 841 (S.D. 1990).  The implied covenant does not imply "an

everflowing cornucopia of wished-for legal duties" nor does it "give rise to new

obligations not otherwise contained in the contract's express terms."  Basin

Elec. Power Co-op, 248 F.3d at 796.  The covenant does not even impose a

general requirement that parties act reasonably.  Id.  Instead, it "acts merely as

a gap filler to deal with circumstances not contemplated by the parties at the

time of contracting."  Id.  Because the covenant is a gap-filler, it cannot negate

any actual terms in the contract.  Id.

It is clear from reading the complaint filed on behalf of BH Hydro-Turf that it has not pleaded a claim against defendants arising from the breach of the covenant of good faith and fair dealing.  However, even if such a claim had been alleged, the court would be unable to rule on the defendants' motion for partial summary judgment on that claim for the same reason discussed above. If the additional square footage of turf establishment which BH Hydro-Turf performed on this contract was simply the result of a larger-than-anticipated area of work in the common areas, it is not bad faith for GBA to refuse to pay BH Hydro-Turf for that extra work.  The common areas were a great "unknown" to both BH Hydro-Turf and to GBA at the time the contract was entered into. BH Hydro-Turf undertook the risk that the common areas might be greater than the parties projected at the time of contracting.  It is not bad faith to hold BH Hydro-Turf to the bargain it struck.

However, if the additional square footage resulted from changes in the contract by either the government or GBA, then BH Hydro-Turf had a right to have GBA execute a change order and to pay BH Hydro-Turf for the extra work. See Docket No. 36-6, page 14, Art. 7.  If GBA refused to do so, it would be breaching the covenant of good faith and fair dealing.  See Prunty Construction, Inc., 2004 S.D. 78, ¶ 26, 682 N.W.2d at 760.

In the Prunty case, the original contract conditions provided that if the subcontractor encountered unanticipated conditions that were materially

different from those conditions inherent in the type of work, the subcontractor was required to obtain a change order from the contractor first, and if one was not forthcoming, the subcontractor was required to halt work until the disagreement was settled.  <u>Id.</u> at ¶ 17, 682 N.W.2d at 757.

Because specific provisions control general ones, however, the court noted that a "Supplemental General Conditions" provision could supersede the original conditions provision.  <u>Id.</u> at ¶¶ 20-21, 682 N.W.2d at 758.   Where the changed circumstance was an increase or decrease in quantity of the units rather than unanticipated, materially different conditions, the supplemental provision did not specifically require work to stop until the change order was approved.  <u>Id.</u>  The first change order regarding a "substandard slope in an existing sewer line" fell into the unanticipated, materially different provision of the contract, and thus would have required prior approval.  <u>Id.</u> at ¶ 22, 25, 682 N.W.2d at 759-60.  Due to conflicting evidence, the court remanded the factual issue of whether the final change order contemplated unanticipated, materially different changes, which would to fall under the original provision and require prior approval, or merely contemplated a change in quantity of units, which would trigger the supplemental provision and not require prior approval.  <u>Id.</u> at ¶ 25, 682 N.W.2d at 760.

Important for this case is the distinction between the requirement of prior approval to continue work, when specifically stated in the contract, and

the lack of such a requirement when not so stated.  See also Wm. Collins v. South Dakota State Bd. of Transp., 264 N.W.2d. 491, 495-96 (where the contract stated: "[e]xtra haul shall be included as a new item on a Construction Change Order and approval obtained prior to performing the work," prior approval *was* a condition precedent).  By its very nature, the final change order in Prunty was designed to reconcile the final quantities used in the contract, and those final quantities could not be known until the project was completed. Id. at ¶¶ 22-24, 26, 682 N.W.2d at 758-60.  The court read the "Supplemental General Conditions" as requiring the owner's *written* approval of the change, but it did not require the owner's *prior* approval before the work was done.  Id. at ¶¶ 21-22, 682 N.W.2d at 758.  In construing the contractual provision applicable to the final change order, the court held that if the owner adamantly required the work contained in the final change order, it would violate the covenant of good faith and fair dealing if it disallowed payment for the work. Id. at ¶ 26, 682 N.W.2d at 760.

The subcontract here, like the one in Prunty dealing with the final change order, requires that GBA issue any change order in writing.   See Docket No. 36-6, page 14, Art. 7.  However, that provision does *not* require the issuance of a change order in writing by GBA as a condition precedent to BH Hydro-Turf doing the required work.  Id.  Nor does the contract require BH Hydro-Turf to halt work if agreement is not reached before the work required

42

by the contractor is to be done.  Id.  Thus, like the provision of the Prunty

contract dealing with the final change order, if GBA did require BH Hydro-Turf

to perform certain work, and if that work was something not contemplated by

the original request for production or design plans drawn up by GBA, then it

would be a violation of the covenant of good faith and fair dealing for GBA to

refuse to authorize payment to BH Hydro-Turf for the extra work after requiring

BH Hydro-Turf to perform that work.  Because the parties do not adequately

explain what the extra work done by BH Hydro-Turf was on this project, the

court cannot determine that summary judgment should issue to GBA on

BH Hydro-Turf's claims.

### 5. GBA Has Not Shown That it is Entitled to Judgment as a Matter of Law

In addition to the above arguments raised by the parties, the court

observes that GBA's motion for summary judgment fails for another very basic

reason.  It is GBA's burden to establish two things: (1) that there are no

disputes as to any material issue of fact and (2) that GBA is entitled to

judgment as a matter of law based on those undisputed facts.

BH Hydro-Turf's complaint alleges that GBA still owes BH Hydro-Turf

money under its contract.  Aside from the issue of whether there was extra

work performed by BH Hydro-Turf that was not contemplated by the parties'

subcontract, GBA admits that it still owes BH Hydro-Turf $57,655 on the

original fixed-price of the contract (after taking into account the four change

orders agreed to by both parties). See GBA's Brief at Docket No. 32, page 9. GBA states that the original contract price, after adjusting for the four change orders, was $476,044. Id. GBA states that it has paid BH Hydro-Turf only $418,389 to date. Id. Therefore, by GBA's own admission, there is a shortfall of $57,655 ($476,044 - $418,389=$57,665) that GBA owes BH Hydro-Turf on the subcontract but has not paid. Id. That is exactly the point of BH Hydro-Turf's complaint—to force GBA to pay the monies owed to BH Hydro-Turf under the contract. GBA has not shown that it is entitled to a defense judgment as a matter of law where GBA admits it still owes BH Hydro-Turf additional monies under the contract.

The court is aware of GBA's counterclaim alleging that it sustained damages as a result of BH Hydro-Turf's alleged breach of contract. GBA alleges in its counterclaim that BH Hydro-Turf never finished the turf establishment work on the subcontract and that GBA incurred extra expense because it had to do some of the work itself, and hired a third party to do part of the unfinished work. See Docket No. 14.

However, GBA does not state a precise dollar figure for its damages on its counterclaim, either in the counterclaim itself or in GBA's motion for summary judgment. Surely that figure is known by now as the construction project at Ellsworth AFB has been completed for many years. Whatever extra work GBA had to do itself, or hire a third party to do, in order to finish the turf

establishment work on this contract has been done and the bills have been paid. For whatever reason, GBA declines to tell the court what its damages are.

The court cannot guess whether GBA's damages equal, exceed, or are less than the $57,655 that GBA admits it still owes to BH Hydro-Turf on the subcontract.[10] For this reason, as well as others discussed above, GBA has not shown entitlement to judgment as a matter of law on BH Hydro-Turf's complaint. The court recommends that defendants' motion for partial summary judgment be denied.

## CONCLUSION

Based on the foregoing, the court respectfully recommends that the district court deny the defendants' motion for partial summary judgment on all of plaintiff Black Hill Hydro-Turf's claims in its amended complaint.

---

[10]BH Hydro-Turf's counsel makes the point in questioning Mr. Barber that if GBA paid a third party to complete the work BH Hydro-Turf was supposed to have completed, GBA would not have sustained any loss if the money it paid to the third party was the same amount of money it would have paid to BH Hydro-Turf to do the same work. In other words, the savings from not making the final payment to BH Hydro-Turf would equal the amount paid to the third party, with the net result that GBA would not have sustained any loss. The same reasoning would apply to any work GBA did itself to finish the turf establishment work. Therefore, the court will not presume that GBA sustained damages, let alone presume that GBA's damages exceed the $57,000 still owed to BH Hydro-Turf under the contract.

**NOTICE OF RIGHT TO APPEAL**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  See Fed. R. Civ. P. 72; 28 U.S.C. § 636(b)(1)(B).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require *de novo* review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated December 19, 2012.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE